IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

JUN 1 0 2025

ARTHUR JOHNSTON
BY _____ DEPUTY

UNITED STATES OF AMERICA

v.

WILLIE DE GIBBS

CRIMINAL NO. 3:25cr 88-DPJ-ASH

18 U.S.C. § 371
18 U.S.C. § 1344
18 U.S.C. § 1347
18 U.S.C. § 1349
18 U.S.C. § 1957(a)

**The Grand Jury Charges:**

At all times relevant to this Indictment:

## GENERAL ALLEGATIONS

### The Medicare Program

1.      Medicare was a federally funded health insurance program that provided health benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

4.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part B covered, among other things, medical items and services provided by physicians, medical clinics, medical device suppliers, and other qualified heath care

providers, such as durable medical equipment.

5.     Physicians, clinics, and other health care providers (collectively, "providers") that provided services to beneficiaries could enroll with Medicare and provide medical services to beneficiaries.  Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6.     When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual.     Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number; (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

7.     Medicare paid for items and services only if they were medically reasonable and necessary, eligible for reimbursement, and provided as represented.  Medicare did not pay for items and services that were procured through the payment of illegal kickbacks or bribes.

**Medicare Part B**

8.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for benefits, items, or services rendered to beneficiaries.  The MACs were responsible

2

for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered item or service. Novitas Solutions Inc. ("Novitas") was the MAC that covered Mississippi, and CGS Administrators, LLC ("CGS Administrators") was the MAC that covered Florida.

9.      Regardless of where services were provided, Novitas received and adjudicated claims in, and paid claims from, Mechanicsburg, Pennsylvania. Similarly, regardless of where services were provided, CGS Administrators received and adjudicated claims in, and paid claims from, Nashville, Tennessee. Therefore, claims submitted electronically from providers in Mississippi to Novitas and from providers in Florida to CGS Administrators necessarily traveled in interstate commerce to be adjudicated.

10.     To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855S, was required to be signed by an authorized representative of the provider. CMS Form 855S contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute . . .).

11.     CMS Form 855S contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

12.     CMS Form 855S also required applicants to disclose to Medicare any individual or organization with an ownership interest, partnership interest, or managing control of a DME

3

supplier. This included: (a) all individuals and organizations with five percent or more of an ownership stake, either direct or indirect, in the DME supplier; (b) all individuals or organizations with a partnership interest in the DME supplier, regardless of the partner's percentage of ownership; (c) all organizations with "managing control" of the DME supplier; and (d) all "managing employees."

13.    "Managing employee" was defined on CMS Form 855S as "a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operations" of the DME supplier, "either under contract or through some other arrangement, whether or not the individual is a W-2 employee" of the DME supplier.

14.    Payments under Medicare Part B were often made directly to the providers rather than to the beneficiaries. For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Durable Medical Equipment

15.    Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, neck braces, and wrist braces (collectively, "braces"), as well as orthotic sleeves.

16.    Medicare reimbursed DME providers for medically necessary items and services rendered to beneficiaries. In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment

was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

17.     Medicare would reimburse claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was actually provided to a beneficiary.

18.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

19.     For certain types of orthotics, such as knee braces billed under HCPCS Code L1833, Medicare required that a provider conduct an in-person examination of a beneficiary and document that examination in the medical record.  According to Medicare, knee braces ordered without a documented in-person examination were not medically necessary.

**The Small Business Administration and Paycheck Protection Program**

20.     The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

21.     As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders.  These loans had government-backed guarantees.

22.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349

billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

23.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain a PPP loan.  In the PPP loan application, the small business (through its authorized representative) was required to state its average monthly payroll expenses and its number of employees, among other things.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation of their payroll expenses.

24.     The PPP loan application also required the small business (through its authorized representative) to make certain closing certifications, including that the borrower or applicant "was in operation on February 15, 2020."

25.     The SBA oversaw the PPP.  Individual PPP loans, however, were issued by private, approved lenders who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number employees, was transmitted by the lender to the SBA in the course of processing the loan.

26.     PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.  Under the applicable PPP

rules and guidance, the interest and principal on PPP loans was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on those permissible expense items within a designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

27.     Lender 1 and Lender 2 participated in the SBA's PPP as lenders and, as such, were authorized to lend funds to eligible borrowers under the terms of the PPP.

### The Defendant and Relevant Entities and Individuals

28.     **WILLIE DE GIBBS** ("**GIBBS**"), of Toomsuba, Mississippi and Cutler Bay, Florida, was the sole owner of Dee's America Supply LLC ("Dee's America Supply"), Elite Diabetic Healthcare Corp ("Elite Diabetic"), L & P Health Supplies LLC ("L & P"), TI Marketing LLC ("TI Marketing"), and A & D One Consulting Corporation ("A & D One"), and was the beneficial owner of and/or controlled, sometimes through or along with friends and/or relatives, D & D Health Supply LLC ("D & D"), Coastal Medical Supply LLC ("Coastal"), A & J Medical Supply LLC ("A & J"), Essential Medical Supplies ("Essential"), and Elderly Care Marketing Corp ("Elderly Care").

29.     Co-conspirator 1, of Toomsuba, Mississippi and Cutler Bay, Florida, was the sole listed member of D & D and worked for **GIBBS** and his entities.

30.     Co-conspirator 2, of Gulfport, Mississippi, was the sole listed manager of Coastal and worked for **GIBBS** and his entities.

31.     Co-conspirator 3, of Lauderdale, Mississippi, was the sole listed manager of A & J and worked for **GIBBS** and his entities.

32.     Co-conspirator 4, of Miami, Florida, was the sole listed manager of L & P, and worked for **GIBBS** and his entities.

33.    Co-conspirator 5, of Fort Lauderdale, Florida, owned and operated Billing Company 1, which entered into contracts to provide medical billing services to **GIBBS** and his entities.

34.    Dee's America Supply, a Mississippi limited liability company formed on April 7, 2020, and located in Meridian, Mississippi, operated as a DME supply company. **GIBBS** was the sole manager of Dee's America Supply and submitted CMS Form 855S on behalf of Dee's America Supply.

35.    Elite Diabetic, a Florida corporation formed on October 10, 2022, and located in Miami, Florida, operated as a DME supply company. **GIBBS** was the sole manager of Elite Diabetic and submitted CMS Form 855S on behalf of Elite Diabetic.

36.    L & P, a Florida limited liability company formed on November 6, 2018, and located in York, Alabama, operated as a DME supply company. **GIBBS** was a beneficial owner, operator, and/or manager of L & P and submitted CMS Form 855S on behalf of L & P, and Co-conspirator 4 was a listed manager of L & P.

37.    D & D, a Mississippi limited liability company formed on February 11, 2022, and located in Meridian, Mississippi, operated as a DME supply company. Although Co-conspirator 1 was the sole listed member of D & D and purportedly submitted CMS Form 855S on behalf of Coastal, **GIBBS** was a beneficial owner, operator, and/or manager of D & D.

38.    Coastal, a Mississippi limited liability company formed on October 14, 2021, and located in Gulfport, Mississippi, operated as a DME supply company. Although Co-conspirator 2 was the sole listed manager of Coastal and purportedly submitted CMS Form 855S on behalf of Coastal, **GIBBS** was a beneficial owner, operator, and/or manager of Coastal.

39.    A & J, a Mississippi limited liability company formed on December 14, 2021, and

8

located in De Kalb, Mississippi, operated as a DME supply company. Although Co-conspirator 3 was the sole listed manager of A & J and purportedly submitted CMS Form 855S on behalf of A & J, **GIBBS** was a beneficial owner, operator, and/or manager of A & J.

40.    Essential, a Mississippi general partnership formed on August 3, 2022, and located in Meridian, Mississippi, operated as a DME supply company. **GIBBS** and Individual 1 were the partners in Essential, and **GIBBS** submitted CMS Form 855S on behalf of Essential.

41.    TI Marketing, a Mississippi limited liability company formed on February 17, 2020, and located in Toomsuba, Mississippi, purported to operate as a marketing company. **GIBBS** owned and controlled TI Marketing.

42.    A & D One, a Mississippi corporation formed on October 10, 2022, and located in Toomsuba, Mississippi, purported to operate as a marketing company. **GIBBS** owned and controlled A & D One.

43.    Elderly Care, a Mississippi corporation formed on July 9, 2018, and located in Toomsuba, Mississippi, purported to operate as a marketing company. **GIBBS** owned and controlled Elderly Care.

44.    Billing Company 1, located in Plantation, Florida, provided medical billing services to providers, including DME suppliers owned and/or operated by **GIBBS**.

45.    Company 1, located in Sacramento, California, entered into an agreement with Dee's America Supply to supply advertisement and data. Company 1 was owned by Individual 2.

46.    Company 2, located in Uttar Pradesh, India, entered into agreements with Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P to provide marketing and consulting services. Company 2 was owned by Individual 3.

47.    Company 3 and Company 4, located in Uttar Pradesh, India, entered into

agreements with Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P to provide marketing and consulting services. Companies 3 and 4 were owned by Individual 4.

48.    Company 5, located in Fort Lauderdale, Florida entered into agreements with Dee's America Supply to provide telehealth platform services. Company 5 was owned by Individual 5.

49.    Company 1, Company 2, Company 3, Company 4, and Company 5 (collectively, the "Companies") purported to act as marketing, advertising, or telemedicine companies, but in fact purchased or otherwise obtained signed doctors' orders for DME, sometimes from doctors who would sign the orders under the guise of telemedicine in exchange for compensation, generally without examining or treating the beneficiaries, and then sell the orders to DME supply companies, including Dee's America Supply, A & J, Coastal, D & D, Elite, Essential, and L & P, on a per-order basis.

## COUNT 1
### The Conspiracy and Its Object

50.    Paragraphs 1 through 19 and 28 through 49 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

51.    Beginning in or around January 2020, and continuing through the date of this Indictment, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

**WILLIE DE GIBBS,**

did knowingly and willfully, that is with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, Individual 2, Individual 3, Individual 4, Individual 5, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

10

a.      To knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      To knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writing, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

52.     It was a purpose of the conspiracy for **GIBBS** and his co-conspirators to unlawfully enrich themselves and others by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for completed DME orders; (b) shipping and delivering medically unnecessary DME to beneficiaries; (c) submitting and causing the submission of claims to Medicare and other health care benefit programs for completed brace orders that were (i) not medically necessary, (ii) obtained through the payment of kickbacks and bribes and therefore not eligible for reimbursement, and/or (iii) not provided as represented; (d) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes, the shipping and delivering of medically

11

unnecessary DME, and the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for the personal use and benefit of **GIBBS** and his co-conspirators, the use and benefit of others, and to further the fraud.

## **Manner and Means**

53.     The manner and means by which **GIBBS** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

a.     **GIBBS** and other co-conspirators, including Co-conspirator 4, formed or acquired, and thereby acquired beneficial ownership interests in, DME suppliers, including Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P.

b.     **GIBBS** recruited his family members and friends, including Co-conspirator 1, Co-conspirator 2, and Co-conspirator 3, to serve as nominee owners of DME suppliers, including A & J, Coastal, and D & D, in order to conceal **GIBBS'** identity as the beneficial owner of these DME suppliers.  Indeed, Co-conspirator 1 went so far as to provide demonstrably false testimony to the Mississippi Board of Pharmacy about the beneficial ownership of D & D.

c.     **GIBBS** and Co-conspirator 1, Co-conspirator 2, and Co-conspirator 3 entered into agreements with Co-conspirator 5 and Billing Company 1 to perform billing services for Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P.

d.     **GIBBS** formed Elderly Care, TI Marketing, and A & D One purportedly to perform marketing services, but Elderly Care, TI Marketing, and A & D One actually served as pass-through entities utilized to pay kickbacks and bribes to the Companies and other purported marketing entities and to fund **GIBBS'** lifestyle.  For example, Elderly Care and TI Marketing had little other business purpose than to receive fraud proceeds transferred from Dee's America Supply, Elite Diabetic, L & P and subsequently pay the Companies, other purported marketing

entities, **GIBBS** and/or Co-conspirator 4, or to fund purchases by **GIBBS**, such as travel expenses to Cancun, Mexico. Similarly, A & D One had little other business purpose than to receive fraud proceeds transferred from D & D, Coastal, and A & J and subsequently pay the Companies, other purported marketing entities, **GIBBS** and/or Co-conspirator 4, or to fund purchases by **GIBBS**, such as luxury vehicles.

        e.     **GIBBS**, through the DME suppliers and pass-through entities that he controlled, paid and caused to be paid kickbacks and bribes to Company 1, Company 2, Company 3, Company 4, Company 5, and other companies in exchange for referring beneficiaries and doctors' orders for braces to Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and/or L & P.

        f.     **GIBBS** negotiated the kickback and bribe arrangements with the Companies and disguised the true nature and source of these kickbacks and bribes by entering into sham contracts for "marketing," "advertising," "telemedicine," or "lead acquisition."

        g.     As **GIBBS** well knew, the brace orders generated due to the kickback and bribe payments were not medically necessary and not eligible for Medicare reimbursement. Some of the orders were written by doctors contracted with the Companies who did not have a pre-existing doctor-patient relationship with the beneficiaries, were not treating the beneficiaries, did not conduct a physical examination, and did not conduct a proper telemedicine visit. Other orders were created out of whole cloth by appropriating the credentials of practitioners to justify the ordering of DME, unbeknownst to the practitioners themselves. Indeed, Dee's America Supply maintained on its computer system mail merge documentation to create patient intake forms for Coastal utilizing misappropriated practitioner information.

        h.     Nevertheless, **GIBBS** and other co-conspirators submitted and caused to be

submitted false and fraudulent claims to Medicare, through the use of interstate wire communications, on behalf of Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P, totaling approximately $19,445,116.69 for DME that was not medically necessary and not eligible for reimbursement.  As a result of these false and fraudulent claims, Dee's America Supply, A & J, Coastal, D & D, Elite Diabetic, Essential, and L & P received payment in the approximate amount of $9,449,289.09.

        i.      **GIBBS** and other co-conspirators, including Co-conspirator 4, used the fraud proceeds received from Medicare to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
### The Scheme and Its Execution

54.     Paragraphs 1 through 19, 28 through 49, and 52 through 53 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

55.     Beginning in or around January 2020, and continuing through the date of this Indictment, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

## WILLIE DE GIBBS,

aiding and abetting and aided and abetted by Co-conspirator 2, Co-conspirator 4, and others known and unknown to the Grand Jury, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

56.    The scheme to defraud is more fully described in Paragraph 53 of this Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

57.    On or about the dates specified below, in the Northern Division of the Southern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **GIBBS** submitted and caused to be submitted the following false and fraudulent claims to Medicare for braces and other DME that were procured through the payment of kickbacks and bribes, not medically necessary, and not eligible for reimbursement, in an attempt to execute and in execution of the scheme, as described in Paragraph 56 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary | DME Supplier | Claim Number | DME Dispensed | Approx. Date Claim Submitted | Approx. Amount Paid |
|---|---|---|---|---|---|---|
| 2 | M.Y. | Dee's America Supply | 122110714426000 | Lumbar-Sacral Orthosis | 4/18/2022 | $917.27 |
| 3 | J.W. | Dee's America Supply | 122123717950000 | Knee Orthosis/ Suspension Sleeve | 4/29/2022 | $673.25 |
| 4 | S.B. | Dee's America Supply | 122130720960000 | Lumbar-Sacral Orthosis | 5/6/2022 | $804.07 |
| 5 | R.F. | Coastal | 122349719964000 | Knee Orthoses/ Suspension Sleeves | 12/13/2022 | $1,180.66 |
| 6 | G.B. | L & P | 123207724604000 | Lumbar-Sacral Orthosis/ Knee Orthoses/ Suspension Sleeves | 7/20/2023 | $2,520.17 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
## The Conspiracy and Its Object

58.    Paragraphs 1 through 19 and 28 through 49 of the Indictment are re-alleged and

15

incorporated by reference as though fully set forth herein.

59.     Beginning in or around January 2020, and continuing through in or around the date of this Indictment, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

**WILLIE DE GIBBS**,

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 5, and others known and unknown to the Grand Jury, to defraud the United States by cheating the United States government or any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371.

**Purpose of the Conspiracy**

60.     It was a purpose of the conspiracy for **GIBBS** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) falsifying and causing the falsification of Medicare enrollment forms to conceal the true beneficial ownership and operational and managerial control of D & D, Coastal, and A & J; (b) submitting and causing the submission, via interstate wire transmission, of false and fraudulent claims to Medicare through D & D, Coastal, and A & J; (c) concealing and causing the concealment of false and fraudulent claims to Medicare; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**Manner and Means**

61.     The manner and means by which **GIBBS** and his co-conspirators sought to

16

accomplish the object and purpose of the conspiracy included, among other things, the following:

a.      **GIBBS** maintained beneficial ownership interests in D & D, Coastal, and A & J.

b.      **GIBBS** recruited his family members and/or friends to serve as nominee owners of D & D, Coastal, and A & J in order to conceal that **GIBBS** was truly the beneficial owner and controller of those DME supply companies.

c.      **GIBBS** falsified and caused the falsification of Medicare enrollment forms, bank records, corporate records, and other documents to conceal the true ownership and management of D & D, Coastal, and A & J.

d.      **GIBBS**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, and others submitted and caused the submission of false and fraudulent claims to Medicare, through the use of interstate wire communications, on behalf of D & D, Coastal, and A & J, totaling approximately $4,729,966.00. Medicare reimbursed D & D, Coastal, and A & J a total amount of approximately $1,664,457.39 for the false and fraudulent claims submitted.

e.      **GIBBS**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 5 and others used the fraud proceeds received from Medicare to benefit themselves and others, and to further the fraud.

**Overt Acts**

62.     In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, at least one of the following overt acts, among others:

a.      On or about March 3, 2022, CMS Form 855S was submitted on behalf of

17

Coastal falsely listing Co-conspirator 2 as the sole owner and individual with managing control of Coastal when, in fact, **GIBBS** was a beneficial owner and participated in managing Coastal. The CMS Form 855S was purportedly signed and submitted by Co-conspirator 2, who resided in Gulfport, Mississippi, and who consented to Co-conspirator 2's identity being used on CMS Form 855S. The email address provided in connection with the application, however, was willie.gibbs43@gmail.com. The Internet Protocol ("IP") address on the submission resolved back to Plantation, Florida, where Billing Company 1 was located.

b.      On or about April 13, 2022, CMS Form 855S was submitted on behalf of A & J, falsely listing Co-conspirator 3 as the sole owner and individual with managing control of A & J, when in fact, **GIBBS** was a beneficial owner and participated in managing A & J. The CMS Form 855S was purportedly signed and submitted by Co-conspirator 3, who resided in Lauderdale, Mississippi, and who consented to Co-conspirator 3's identity being used on CMS Form 855S. The IP address on the submission resolved back to Plantation, Florida, where Billing Company 1 was located.

c.      On or about May 6, 2022, CMS Form 855S was submitted on behalf of D & D, falsely listing Co-conspirator 1 as the sole owner and individual with managing control of D & D when, in fact, **GIBBS** was a beneficial owner and participated in the management of D & D. The CMS Form 855S was purportedly signed and submitted by Co-conspirator 1, who maintained a residence in Toomsuba, Mississippi, and who consented to Co-conspirator 1's identity being used on CMS Form 855S.

d.      On or about October 27, 2022, D & D wrote a check signed by Co-conspirator 1 from an account held in Meridian, Mississippi, to an A & D One account, also held in Meridian, Mississippi, in the amount of $40,000 with the memo line "Consulting

Services/Website Development." D & D did not maintain a website.

   e.  From November 1, 2022 through July 24, 2023, Coastal transferred $323,592.18 from an account it held in Gulfport, Mississippi to an account held by A & D One in Meridian, Mississippi, on which **GIBBS** was the only authorized signer.

   f.  On or about December 28, 2022, D & D transferred $100,000 from an account it held in Meridian, Mississippi, to an account held by A & D One in Meridian, Mississippi, on which **GIBBS** was the only authorized signer.

   g.  From January 6, 2023 through July 18, 2023, A & J transferred $372,028.68 from an account held in Meridian, Mississippi to an account held by A & D One in Meridian, Mississippi, on which **GIBBS** was the only authorized signer.

  All in violation of Title 18, United States Code, Section 371.

## COUNT 8
### The Conspiracy and Its Objects

63.  Paragraphs 1 through 19, 28 through 49, and 52 through 53 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

64.  Beginning in or around January 2020, and continuing through in or around the date of this Indictment, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

**WILLIE DE GIBBS**,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Individual 2, Individual 3, Individual 4, Individual 5, and others known and unknown to the Grand Jury, to:

   a.  solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for the purchasing, leasing, ordering, and arranging

for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B); and

b.    offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, to any person to induce such person to purchase, lease, order, and arrange for and recommend the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

## Purpose of the Conspiracy

65.    It was the purpose of the conspiracy for **GIBBS** and his co-conspirators to unlawfully enrich themselves and others by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for completed brace orders; (b) shipping and delivering medically unnecessary DME to beneficiaries; (c) submitting and causing the submission of claims to Medicare for completed brace orders that were (i) not medically necessary, (ii) obtained through the payment of kickbacks and bribes and therefore not eligible for reimbursement, and/or (iii) not provided as represented; (d) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes, the shipping and delivering of medically unnecessary DME, and the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for the personal use and benefit of **GIBBS**, his co-conspirators, the use and benefit of others, and to further the fraud.

## Overt Acts

66.    In furtherance of the conspiracy, and to accomplish its objects and purpose, **GIBBS** and his co-conspirators committed and caused to be committed, in Lauderdale County, in the

Northern Division of the Southern District of Mississippi, and elsewhere, the following overt acts:

      a.      On or about October 4, 2022, Coastal billed Medicare for two wrist/hand orthoses for beneficiary F.B. and was paid approximately $402.29.

      b.      On or about October 14, 2022, Individual 3 sent **GIBBS** an invoice seeking $11,300 paid to Company 2 for doctors' orders for various beneficiaries, including F.B., whose specific orders cost $200.

      c.      On or about October 17, 2022, TI Marketing made a wire transfer to Company 2 in the amount of $11,000.

      d.      On or about November 10, 2022, **GIBBS** entered into a contract on behalf of Dee's America Supply with Company 1 for Company 1 to provide "advertisement and data" to Dee's America Supply, when, in truth and in fact, as **GIBBS** well knew, Dee's America Supply was contracting to pay Company 1 kickbacks for fraudulent doctors' orders for DME on a per-order basis.

      e.      On or about January 3, 2023, A & J billed Medicare for a lumbar-sacral orthosis, two knee orthoses, and suspension sleeves for beneficiary J.W. and was paid $1,808.97.

      f.      On or about January 20, 2023, **GIBBS**, through Dee's America Supply, paid Company 1 $39,950.00 in kickbacks in exchange for doctors' orders for braces and other DME, to be dispensed to beneficiaries and others. The invoice from Company 1 to Dee's America Supply did not request payment for "advertisement and data," as discussed in the contract between the parties, but instead requested payment for 150 leads and, as support, listed the names of specific beneficiaries and brace orders. That list included beneficiary J.W.

      g.      On or about February 1, 2023, **GIBBS**, through TI Marketing, paid Company 1 $42,850.18 in kickbacks in exchange for doctors' orders for braces and other DME,

to be dispensed to beneficiaries and others. The invoice from Company 1 to Dee's America Supply again requested payment for 150 leads, and, as support, listed the same names of beneficiaries sent on the prior month's invoice.

        h.      On July 13, 2023, **GIBBS** appeared on behalf of Dee's America Supply at an administrative hearing held by the Mississippi Board of Pharmacy. At that hearing, **GIBBS** falsely testified that Dee's America Supply received orders for DME from doctors. **GIBBS** also falsely testified that the doctors learned about Dee's America Supply through networking and that he entered into verbal contracts with "doctors that I know and friends that I know." When asked if the "contracts" were on a per order basis, **GIBBS** testified, "But, no, you can't do that. That's called anti-kickback."

        i.      On or about October 24, 2024, Dee's America Supply, A & J, D & D, Elite, L & P, Coastal, and Essential, through **GIBBS**, entered into agreements with Company 2, through Individual 3, for Company 2 to provide services, including "screening call center traffic" and "assist[ing] in developing marketing strategies and campaigns" to the DME suppliers, when, in truth and in fact, as **GIBBS** well knew, the DME suppliers were contracting to pay Company 2 kickbacks for fraudulent doctors' orders for DME on a per-order basis.

        All in violation of Title 18, United States Code, Section 371.

### COUNTS 9-10

    67.      Paragraphs 1 through 19, 38 through 49, and 52 through 53 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

    68.      On or about the dates set forth as to each count below, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

### WILLIE DE GIBBS,

did knowingly engage and attempt to engage in a monetary transaction affecting interstate and foreign commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, and wire fraud, in violation of Title 18, United States Code, Section 1343:

| Count | Description | Approximate Date of Payment | Amount |
|-------|-------------|-----------------------------|--------|
| 9 | Transfer from A & D One account x2188 held by GIBBS to personal account x0798 held by GIBBS and Co-conspirator 4 | 4/28/2023 | $300,000 |
| 10 | Transfer from A & D One account x2188 to Faith and Deliverance Church Account x4512, both accounts held by GIBBS | 6/1/2023 | $57,450.75 |

Each of the above is a violation of Title 18, United States Code, Sections 1957(a) and 2.

## COUNTS 11-12
## The Fraudulent Scheme

69.     Paragraphs 20 through 49 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### Purpose of the Scheme

70.     The purpose of the scheme was for the defendant to fraudulently obtain PPP loans and to conceal the scheme.

### Manner and Means of the Scheme

71.     The manner and means by which **GIBBS** sought to accomplish the purpose of the scheme included, among others:

a.       On or about March 29, 2021, **GIBBS** submitted a PPP loan application to Lender 1 on behalf of TI Marketing, which **GIBBS** solely owned and operated.  As part of the application, **GIBBS** executed a "Borrower's Closing Certification," whereby **GIBBS** certified,

23

among other things, that "Borrower was in operation on February 15, 2020." Of course, as **GIBBS**
well knew, TI Marketing was not formed until February 17, 2020, and did not open a bank account
until that date.

        b.     As a supporting document to the PPP loan application with Lender 1,
**GIBBS** falsified an Elderly Care banking statement from February 2020 to submit as false proof
that TI Marketing was in operation on February 15, 2020.

        c.     On or about April 2, 2021, **GIBBS** submitted a PPP loan application to
Lender 2 on behalf of Dee's America Supply, which **GIBBS** solely owned and operated. As part
of the application, **GIBBS** initialed various good faith certifications prior to signing the
application, including that "The Applicant was in operation on February 15, 2020." Of course, as
**GIBBS** well knew, Dee's America Supply was not formed until April 7, 2020, and did not open a
bank account until that date.

        d.     As a supporting document to the PPP loan application with Lender 2,
**GIBBS** falsified the same Elderly Care banking statement from February 2020 to submit as false
proof that Dee's America Supply was in operation on February 15, 2020.

        e.     Based on the materially false and fraudulent representations and
submissions in the fraudulent PPP applications and supporting documentation submitted by
**GIBBS**, Lender 1 and Lender 2 funded the requested PPP loans in the amount of $20,833.00 per
loan. Lender 1 funded TI Marketing's PPP loan in the amount of $20,833.00 on April 1, 2022,
and Lender 2 funded Dee's America Supply's PPP loan in the amount of $20,833.00 on April 12,
2022.

        f.     The PPP loan funds were deposited into the respective business checking
accounts of TI Marketing and Dee's America Supply. **GIBBS** was the signatory on both accounts.

**Executions of the Scheme**

72.     Beginning in or around March 2021, and continuing through in or around at least April 2022, in Lauderdale County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

**WILLIE DE GIBBS**,

knowingly executed and attempted to execute a scheme and artifice to defraud the financial institutions identified below, the deposits of which were insured by the FDIC, and to obtain by means of materially false and fraudulent pretenses, representations and promises, and by omission of material facts, moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, the listed financial institutions:

| Count | Approximate Date | Description | Amount Paid |
|-------|------------------|-------------|-------------|
| 11 | 3/29/2021 | **GIBBS** submitted a false and fraudulent PPP loan application and supporting document on behalf of TI Marketing to Lender 1, which caused Lender 1 to disburse loan benefits to account x1179 held by TI Marketing, on which **GIBBS** was the sole signatory | $20,833.00 |
| 12 | 4/2/2021 | **GIBBS** submitted a false and fraudulent PPP loan application and supporting document on behalf of Dee's America Supply to Lender 2, which caused Lender 2 to disburse loan benefits to account x6395 held by Dee's America Supply, on which **GIBBS** was the sole signatory | $20,833.00 |

Each of the above is a violation of Title 18, United States Code, Sections 1344 and 2.

**FORFEITURE ALLEGATIONS**

73.     Upon conviction of a federal health care offense, as defined in Title 18, United States Code, Section 24, as alleged in this Indictment, the defendant, **WILLIE DE GIBBS**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to 18 U.S.C.

§ 982(a)(7).

74.     Upon conviction of a violation of Title 18, United States Code Sections 1956 or 1957, as alleged in this Indictment, the defendant, **WILLIE DE GIBBS**, shall forfeit to the United States any property, real or personal, involved in such violation, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

75.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

PATRICK A. LEMON
Acting United States Attorney

LORINDA LARYEA
Acting Chief, Fraud Section
United States Department of Justice

A TRUE BILL:
S/ SIGNATURE REDACTED
Foreperson of the Grand Jury

This indictment was returned in open court by the foreperson or deputy foreperson of the grand jury on this the _10th_ day of June 2025.

UNITED STATES MAGISTRATE JUDGE

26